## THE MARY BRADFORD.[1]

(*Circuit Court, E. D. New York.* July 16, 1884.)

BILL OF LADING—INDORSEMENT FOR VALUE—MASTER'S COPY—DELIVERY OF CARGO.

The decree of the district court in the same case (18 FED. REP. 189) affirmed.

In Admiralty.

*F. E. & A. Blackwell,* for libelant.

*Beebe & Wilcox,* for claimants.

BLATCHFORD, Justice.   In this case I find the following facts:

The agent of the owners of the schooner Mary Bradford chartered her to William L. Carbin, of New York, for a voyage from New York to Nickerie, and back to New York, by the charter-party, dated September 12, 1881, of which a copy is set forth in the apostles.   D. C. Cobb was the master of said schooner.   William L. Carbin shipped on her from New York a cargo consigned to his brother R. J. Carbin at Nickerie.   William L. Carbin directed the master to follow the instructions of R. J. Carbin on the arrival of the vessel at Nickerie.   Bills of lading were signed in New York by the master for the cargo shipped by the vessel to Nickerie.   When she arrived at Nickerie, the master discharged the cargo.   He then received on board of the vessel from R. J. Carbin the merchandise covered by the bill of lading, libelant's Exhibit A, dated November 24, 1881, of which a copy is set forth in the apostles.   This cargo being on board, the master signed a set of four bills of lading for it, all of the tenor of said Exhibit A.   Three of these he delivered to R. J. Carbin, and one he kept himself.   This last-named bill of lading was the "captain's copy," and was understood by R. J. Carbin and by the master to be such.   When such captain's copy was so left with the master, no instructions were given to him in respect to it.   R. J. Carbin took the said three bills of lading, and before the vessel sailed from Nickerie, hypothecated them with the libelant as collateral security for the payment of the sum of $4,800, or its equivalent in Dutch money, and duly indorsed said bills of lading over to the libelant, and received from it said sum of money.   In the bills of lading in the hands of the libelant, the words "as per charter-party" appear written between the words "said produce" and the words "with primage," as in libelant's Exhibit D in the apostles, which words are not in said libelant's Exhibit A.

The libelant was and is a foreign corporation, duly organized and existing pursuant to a charter and under the laws of the kingdom of the United Netherlands.   At the time of the receipt by R. J. Carbin of the said sum of $4,800, or its equivalent in Dutch money, to-wit, November 29, 1881, he drew three bills of exchange in a set (first, second, and third) upon his brother William L. Carbin of the tenor of Exhibit No. 1, annexed to the deposition of Arend d'Angremond, in the apostles; and also executed and delivered to the libelant a paper writing, dated November 29, 1881, a correct translation of which is contained in libelant's Exhibit F in the apostles.   The libelant duly transmitted two of said bills of exchange and two of said bills of lading to its agent in the city of New York, who received them December 28, 1881.   On December 29, 1881, one of said bills of exchange was duly accepted in writing by the drawee, William L. Carbin.   It fell due March 2, 1882.   On the eighteenth of December, 1881, the said vessel arrived at the port of New York, from Nickerie, and thereupon B. J. Wenberg, the agent of the vessel,

[1]Reported by R. D. & Wyllys Benedict, Esqs., of the New York bar.

with the knowledge of her said master, took from the papers of the vessel the said "captain's copy" of the bill of lading, and delivered the same to the said William L. Carbin; the said Wenberg then knowing that the said copy was the "captain's copy," and the said William L. Carbin, before the twenty-eighth of December, 1881, received under the said "captain's copy" the merchandise named therein, from the said vessel and the said master. None of the said bills of exchange have ever been paid, or any part thereof.

The said agent, in New York, of the libelant learned on the twenty-ninth of December, 1881, that said cargo had been delivered to William L. Carbin, and thereupon, by the first opportunity, communicated that information to the libelant at Paramaribo, where it was established, and where the transaction between it and R. J. Carbin took place; and on the receipt of an answer to such communication, the libel herein was filed on March 31, 1882, as soon as the vessel could be found. On that day, the bill of lading aforesaid was presented to the master of the vessel by the agent of the libelant, and a demand was duly made for said cargo, which was refused. The bill of lading so kept by the master as the "captain's copy," was indorsed in blank at the time by said R. J. Carbin, but it did not, at that time, contain the words, "deliver to the order of William L. Carbin," or any of them, indorsed on the back thereof; nor were said words, or any of them, written thereon at any time by said R. J. Carbin, or by his authority, or that of the libelant; but said words were written thereon by William L. Carbin after the delivery of said "captain's copy" to him at New York, as they now appear in said libelant's Exhibit A.

On the foregoing facts I find the following conclusions of law:

The master was authorized to sign and deliver to R. J. Carbin the bills of lading; and, in any event, the delivery to William L. Carbin by Wenberg, the agent of the vessel, of the captain's copy of the bill of lading, was a ratification of the act of the master in delivering to R. J. Carbin the bills of lading which were delivered to him by the master. The copy of the bill of lading kept by the master was the captain's copy,—the vessel's bill of lading,—and merely for the information of the master and agent and owners of the vessel, and the delivery thereof to William L. Carbin was a wrongful act as against the libelant, for which the vessel is liable to it. The libelant was guilty of no laches.

There should be a decree for the libelant of the same tenor as the decree in its favor in the district court, with its costs in this court to be taxed.

---

THE CARO.[1]

(*District Court, E. D. New York.* September 22, 1884.)

COLLISION—STEAM AND SAIL VESSELS—APPROACHING STEAMER—TORCH-LIGHT— TUG AND TOW—LOOKOUT—LIGHTS.

Where a collision occurred on the ocean between a bark and a schooner which was in tow of a tug, and the tug's lights were seen by the bark some two miles off, but the bark's lights were not seen by the tug or the schooner till collision was inevitable, the night being dark, but a good night to see lights, and the vessels approached each other on such courses that the bark passed within 100 feet of the tug, *held,* that the bark was in fault for not showing a torch on her bow, and the collision must be held on that ground alone to have been caused by her fault; that, as the bark had her side lights placed on the mizzen rigging

1 Reported by R. D. & Wyllys Benedict, Esqs., of the New York bar.